UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

P.R.A. COMPANY, d/b/a  VANTAGE PLASTICS,

                Plaintiff,                        Case No. 1:24-cv-10204

v.                                         Honorable Thomas L. Ludington
                                         United States District Judge

ARGLASS YAMAMURA SE, LLC,

                Defendant.

_____/

**OPINION AND ORDER GRANTING DEFENDANT'S MOTION TO DISMISS IN PART**

In late 2019, Defendant Arglass Yamamura SE, LLC—a Georgia glass bottle manufacturer—announced a plan to open a new production plant. But with expanded glass production comes expanded shipping and transportation needs. So, in May 2020, Defendant began discussing a five-year "Pallet Program" Agreement with Plaintiff P.R.A. Company—a Michigan manufacturer of plastic shipping pallets and tier sheets. Under the contemplated terms of the Pallet Program Agreement, Defendant would pay Plaintiff a one-time "tooling" fee for designing and molding Defendant's custom pallets. Thereafter, Defendant would pay Plaintiff monthly rental payments to cover Defendant's use and Plaintiff's profit margins.

But the Pallet Program Agreement never came to fruition. Yet Defendant continued to produce glass and relied on Plaintiff to provide tier sheets for shipping. In August 2020, Defendant issued a $82,489 purchase order for Plaintiff's "tooling." Four months later, the Parties signed an "Interim Tier Sheet Agreement," which provided that, if the Parties did *not* execute the master Pallet Program Agreement, Defendant would pay Plaintiff $5.32 per tier sheet, plus Plaintiff's freight costs. But Plaintiff alleges Defendant never paid for the tens of thousands of tier sheets Plaintiff provided, nor has Defendant paid Plaintiff's tooling costs in full.

So Plaintiff sued in January 2024. Plaintiff's Amended Complaint alleges Defendant breached both the December 2020 Tier Sheet Agreement and the August 2020 Tooling Purchase Order. Plaintiff also pursues three quasi-contract claims, two of which are pled in the alternative to Plaintiff's claim that Defendant breached the December 2020 Tier Sheet Agreement. Lastly, Plaintiff pursues a Michigan statutory conversion claim alleging Defendant wrongfully deprived, converted, and retained Plaintiff's tier sheets.

In April 2024, Defendant filed a partial motion to dismiss. Defendant concedes that the August 2020 Tooling Purchase Order and the December 2020 Tier Sheet Agreement were valid contracts and, accordingly, does not challenge Plaintiff's two breach of contract claims. As explained below, Defendant's motion to dismiss all other claims will be granted in large part. Because Defendant concedes the December 2020 Tier Sheet Agreement was a *valid* contract, Plaintiff's two alternative quasi-contract claims predicated on the *invalidity* of this contract— Counts IV and V—must be dismissed. Similarly, the presence of this valid contract precludes Plaintiff's statutory conversion claim—Count VI—under the economic loss doctrine. But Plaintiff's promissory estoppel claim in Count III survives because it is not precluded by any contract between the Parties, and is adequately alleged in Plaintiff's Amended Complaint.

## I.

### A.

This case concerns a large materials contract that never materialized, and two smaller, ancillary contracts that did. Plaintiff P.R.A. Company—doing business as Vantage Plastics—is a Michigan company that "designs, tools, and manufactures plastic products" such as "plastic pallets and tier sheets."[1] ECF Nos. 1 at PageID.2–3; 11 at PageID.135. Defendant Arglass Yamamura SE,

---

[1] A "tier sheet" is inserted between levels of products on pallets to evenly distribute weight, provide

LLC is a glass bottle manufacturer based in Georgia. ECF No. 1 at PageID.2. Defendant specifically manufactures glass bottles for use in the food and beverage industry. ECF No. 14 at PageID.205.

As alleged, in late 2019, Defendant announced a plan to open a glass manufacturing plant in Valdosta, Georgia (the "Georgia Plant"). ECF No. 11 at PageID.136. In May 2020, the Parties "began discussing" Plaintiff's provision of custom plastic pallets and tier sheets—also known as "Pallet Combos"—to Defendant for use at the Georgia Plant. *Id.* at PageID.137. Specifically, Defendant "explained it needed" 30,000 Pallet Combos—30,000 pallets and 210,000 tier sheets[2]— designed specifically for Defendant's "'state of the art' palletizing and bagging equipment" in its new Georgia Plant. *Id.* In June 2020, Greg Murphy, one of Plaintiff's sales employees, met with Defendant's CEO, José de Diego Arozamena, and Defendant's Head of Supply Chain, Joe Luna, to discuss the contemplated five-year "Pallet Program." *See id.* at PageID.138–39. Following the meeting, Plaintiff sent Defendant a draft "Pallet Program Agreement" on June 23, 2020. *Id.* Under the initial terms, Plaintiff would design and provide Defendant with 30,000 Pallet Combos, collectively valued at just under $5,000,000. *Id.* In exchange, Defendants would pay Plaintiff a monthly $89,768 usage fee, in addition to an upfront, one-time $82,489 fee covering Plaintiff's design and "tooling"—or molding—of the prototype pallets and tier sheets. ECF No. 11 at PageID.138–39. In response to these draft terms, Defendant's CEO stated that Defendant "would be delighted to work with" Plaintiff. *Id.* at PageID.139.

---

load stability, and minimize damage. *See Plastic Tier Sheets*, FRESH PAK, https://freshpakcorp.com/product/plastic-tier-sheets/#:~:text=Plastic%20Separator% 20Sheets%20also%20called,life%20and%20multiple%20repack%20turns (last visited Oct. 24, 2024) [https://perma.cc/55XJ-2TSA].
[2] As contemplated by the Parties, a single "Pallet Combo" consists of *one* pallet and *seven* tier sheets. *See* ECF No. 14-2 at PageID.239.

But the Parties never finalized the Pallet Program Agreement, and each Party faults the other for the hang up. According to Plaintiff, Defendant struggled to accurately estimate the long-term needs of the Georgia Plant, which prevented it from "pinning-down the specific quantity of Pallet Combos [it] wanted and when." ECF No. 1 at PageID.6; *see also* ECF No. 16 at PageID.287. But, at the same time, Defendant had an immediate, short-term need for Pallet Combos given the Georgia Plant's quickly approaching opening. *See id.* According to Defendant, Plaintiff's plastic products did not "me[e]t [Defendant]'s specifications." ECF No. 14 at PageID.205.

But this Pallet Program snag did not stop the Parties from working with one another, and executing two smaller, ancillary agreements. On August 11, 2020, Defendant issued a $82,489 purchase order (the "August 2020 Tooling Purchase Order") reflecting Plaintiff's costs to tool two different pallet sizes for Defendants' use throughout the contemplated Pallet Program, even though the Parties were still negotiating the terms of the Pallet Program Agreement. ECF Nos. 11 at PageID.140; 11-2 at PageID.164.

In late September 2020—with no finalized Pallet Program Agreement in place—Defendant "directed [Plaintiff] to deliver" 5,000 pallets and 35,000 tier sheets by December 2020, and another 5,000 pallets and 35,000 tier sheets by the end of January 2021. ECF No. 11 at PageID.140. On September 30, 2022, Defendant's CEO advised Plaintiff that Defendant was "prepared to accept" the latest terms of the proposed Pallet Program Agreement, and that the Parties "ha[d] a deal" if Plaintiff had no revisions. *Id.* at PageID.141. But Plaintiff had revisions, and the Parties continued to negotiate terms. On October 2, 2020, Defendant's Head of Supply Chain emailed Plaintiff directing it to begin the tooling reflected in the August 2020 Purchase Order. *Id.*; *see also* ECF No. 11-4 at PageID.168 ("Yes, Please Proceed, We Approve Tooling subject to Contract."). On November 18, 2020, Plaintiff delivered ten prototype pallets and fifty tier sheets to Defendant's

Georgia Plant for testing. ECF No. 11 at PageID.141.

Defendants officially opened the Georgia Plant on November 30, 2020. *Id.* But the Georgia Plant's opening further complicated the Parties' relationship. Due to unidentified equipment issues, Defendant could not test Plaintiffs' prototype pallets. *See id.* at PageID.145. So Defendant resorted to using its *own*, *wooden* pallets to transport its newly produced glass products. *Id.* at PageID.142. But Defendant still needed tier sheets, so in December 2020, Defendant requested Plaintiff produce and deliver 100 tier sheets separate from the Pallet Program Agreement the Parties were still negotiating. *Id.* On December 15, 2020, Defendant confirmed receipt of the tier sheets and, according to Plaintiff, "confirm[ed] the tier sheets could be used with [Defendant's] existing [wooden] pallet inventory." *Id.*   Indeed, Defendant then requested Plaintiff produce 45,000 tier sheets—10,000 more than initially contemplated in the Parties' proposed Pallet Program Agreement—by the end of the month. *Id.* Accordingly, the Parties entered into an Interim Tier Sheet Agreement (the "December 2020 Tier Sheet Agreement"), which provided, in relevant part:

> Whereas both [Plaintiff] and [Defendant] work toward finalizing a [Pallet Program] Agreement . . . [Plaintiff] has in good faith begun production of the Tier Sheets that are meant to be part of the [Pallet Program] Agreement. . . . At first, this was for [Defendant] to run internal testing *[but] has now moved into [Defendant's] need for production quantities of Tier Sheets for normal use* with alternative pallets.

> By the date of 12-21-20[20], [Plaintiff] will have supplied *10,500 of these production quality Tier Sheets*.

> The purpose of this agreement is . . . that[,] *in the event the parties cannot get the [Pallet Program] Agreement* signed and in place, in which these Tier Sheets would be covered under that []Agreement, that *[Defendant] will pay [Plaintiff] at a rate of $5.32/each plus freight, for all Tier Sheets* requested by [Defendant] and supplied by [Plaintiff] *from today's date forward.*

ECF No. 11-7 at PageID.178 (emphasis added). In other words, and as alleged, Defendant agreed to pay Plaintiff $5.32 for each tier sheet Plaintiff provided starting in December 2020—including

the 10,500 sheets expressly requested by Defendants—plus freight costs *if* the Parties did not sign the master Pallet Program Agreement. *See id.* Importantly, the Tier Sheet Agreement was written, and signed by Defendant's then-Head of Supply Chain Joe Luna, and Plaintiff's President Paul Aultman.[3] ECF No. 1-6 at PageID.44.

In accordance with the Tier Sheet Agreement, Plaintiff delivered 10,416 tier sheets to Defendant on December 21, 2020.[4] ECF No. 11 at PageID.144. But Defendant did not use these sheets, and asked Plaintiff to "pause [further] delivery" of tier sheets, due to concerns its customers would not return them. *Id.* at PageID.144–45.

Throughout the next four months, the Parties worked to finalize prototype testing. Defendant resolved an issue with its "equipment manufacturer/vendor" which was preventing Defendant from testing Plaintiff's pallets. *Id.* Plaintiff sent Defendants ten more prototype plastic pallets and a "steel plate for use with the palletization testing." *Id.* at PageID.145 (alleging this steel plate was necessary after Defendant resolved the equipment issue). And, on April 13, 2021, Defendant confirmed that Plaintiff's pallets passed testing and that Defendant was "ready to move forward" with the draft Pallet Program Agreement. *Id.* at PageID.145–46.

During an April 22, 2021 meeting, Defendant's CEO directed Plaintiff to begin producing the pallets and remaining tier sheets as contemplated in the draft Pallet Program Agreement, as the

---

[3] The precise date the Parties executed the Tier Sheet Agreement is unclear. The Tier Sheet Agreement and both Parties' signatures on it are dated December 17, 2020. *See* ECF No. 11-7 at PageID.178. But, according to Plaintiff, Defendant did not sign the Tier Sheet Agreement until six days later, on December 23, 2022. ECF No. 11 at PageID.144. Plaintiff explains that the Parties discussed and agreed to the Tier Sheet Agreement's terms over the phone on December 17, 2020. *Id.* at PageID.143. Plaintiff sent Defendant the Tier Sheet Agreement immediately after this phone call. *Id.* But Defendant did not respond or sign until six days later, after Plaintiff sent two emails requesting Defendant's signature. *See id.* at PageID.143–44.

[4] Plaintiff does not explain why only 10,416 tier sheets were provided instead of the 10,500 as contemplated by the Tier Sheet Agreement. *See generally id.*

Parties continued to finalize its other terms. *Id.* at PageID.146. On June 7, 2021, Plaintiff sent the latest draft of the Pallet Program Agreement to Defendant but advised it would not ship the pallets and tier sheets already in production until the Agreement was finalized and signed. *Id.* Defendant did not respond. *See id.* So, Plaintiff sent a follow-up email on June 16, 2021, noting Plaintiff was "accumulating truckloads of product and need[ed] to begin shipping as soon as possible." *Id.* at PageID.146–47 (emphasis omitted).

Defendant's June 21, 2021 response explained—allegedly for the first time—that Defendant needed more time to execute the Agreement because it was waiting on (1) its "bank" to review the Agreement; and (2) its customers to sign separate agreements ensuring they would return the pallets and tier sheets. *See id.* at PageID.147. So Plaintiff paused production. *Id.* On August 5, 2021, Defendant informed Plaintiff that the *only* things precluding Defendant from signing the Pallet Program Agreement "were issues with" traceability, yet Defendant requested Plaintiff "release" 11,550 additional tier sheets for expedited shipping once these issues were resolved. *Id.* at PageID.147–48; *see also* ECF No. 1 at PageID.17. Plaintiff "released" these additional tier sheets on August 9, 2021. ECF No. 11 at PageID.148.

On August 31, 2021—despite earlier assurances that the only things precluding the Agreement's execution were tracing issues—Defendant's CEO informed Plaintiff's President that Plaintiff's pallets needed to pass additional testing. *See* ECF No. 11 at PageID.148. So Plaintiff sent Defendant seven additional prototype pallets. *Id.* Defendant attempted to test these pallets on September 15, 2021. *Id.* But, again, Defendant experienced "bagging equipment" issues that prevented testing. *Id.* Defendant accordingly informed Plaintiff it would re-test Plaintiff's pallets once its bagging equipment issues were fixed, noting—allegedly for the first time—that Defendant needed to ensure Plaintiff's pallets conformed with Defendant's *customer's* lines, as well. *Id.* at

PageID.148–49 (alleging this "was completely illogical considering the pallets had not been designed for use in anything other than [Defendant's] equipment per [Defendant's] stated intent and engineering specifications").

Much remains unknown about the next eight months. But all Parties agree the Pallet Program Agreement was never executed. *Id.* at PageID.149; ECF No. 14 at PageID.205. Plaintiff alleges Defendant also refused to pay Plaintiff's tooling costs as contemplated in the August 2020 Tooling Purchase Order, "refused to pay . . . for the 10,416 tier sheets which [Defendant] had been using since December 2020, and refused to pay security deposits to cover [Plaintiff]'s investment and margins to date." ECF No. 11 at PageID.149 (internal quotations omitted). "By November 2021," Plaintiff alleges it "incurred $615,043.81 in material procurement and manufacturing costs for the pallets and tier sheets" it designed for Defendant. ECF No. 11 at PageID.149.

In July 2022—over two years after the Parties began discussing the Pallet Program— Plaintiff decided it was time for Defendant to pay the piper. Plaintiff accordingly sent "the first of several" demand letters to Defendant, requesting payment under the terms of the August 2020 Tooling Purchase Order and the December 2020 Tier Sheet Agreement.[5] *Id.* But Defendant did not pay, allegedly because, in its view, (1) the December 2020 Tier Sheet Agreement was not valid and, alternatively, did not govern the 11,500 tier sheets Plaintiff released in August 2021; (2) the 10,416 tier sheets Plaintiff provided in December 2020 were for "testing" purposes only; and (3)

---

[5] Plaintiff's initial complaint, filed in January 2024, quoted a specific demand letter sent on July 13, 2022. ECF No. 1 at PageID.19. In that letter, Plaintiff attached a copy of the December 2020 Tier Sheet Agreement and requested Defendant pay $118,800. *Id.* Specifically, Plaintiff sought $5.32 for each of the 10,500 tier sheets it shipped Defendant in December 2020, as well as an additional 10,500 sheets "on [Plaintiff's] floor that [we]re fully converted, die cut, and sealed for [Defendant]." *Id.* Additionally, under the December 2020 Tier Sheet Agreement's terms, Plaintiff requested Defendant pay $7,080 in freight costs. For reasons unknown, Plaintiff did not repeat this allegation when it amended its Complaint. *See generally* ECF No. 11.

these tier sheets failed testing, were not reusable, and were rejected by Defendant's customers.[6]
*Id.* at PageID.150. Plaintiff disputes these claims, and alleges Defendant used Plaintiff's tier sheets
for at least "three turns" throughout March 2021 and November 2023 and profited from daily rental
rates Defendant charged its customers. *Id.* at PageID.150, 157.

Having received no payment, Plaintiff sued Defendant in January 2024, ECF No. 1, and
filed an Amended Complaint less than two months later, ECF No. 11.

**B.**

In Count I of Plaintiff's Amended Complaint, Plaintiff alleges Defendant breached the
December 2020 Tier Sheet Agreement by (1) failing to pay for the 10,416 tier sheets Plaintiff
provided in December 2020; (2) failing to pay for the additional 11,550 tier sheets Plaintiff
provided in August 2021; and (3) failing to pay for Plaintiff's corresponding freight costs. ECF
No. 11 at PageID.151–52. In Count II, Plaintiff alleges Defendants breached the August 2020
Tooling Purchase Order by failing to fully pay Plaintiff for its tooling work.[7] *Id.* at PageID.153. In
Count III, Plaintiff seeks—under the theory of promissory estoppel—$615,043.81 for the "time,
costs, and expenses" it incurred in reliance on Defendant's alleged false assurances that it would
sign and execute the master Pallet Program Agreement. *Id.* at PageID.154–55. Counts IV and V

---

[6] Again, for reasons unknown, Plaintiff's operative, Amended Complaint *excludes* and
*paraphrases* specific factual allegations asserted in Plaintiff's initial, nonoperative complaint. For
example, in the original complaint, Plaintiff provided specific examples of conversations between
it and Defendant regarding Plaintiff's demand letters and Defendant's refusal to pay. *See* ECF No.
1 at PageID.20 (noting Defendant informed Plaintiff "it was a test [o]nly, we do this every day, if
a bottle does not work, we can make thousands and if the quality is bad, we get rejected"); *see also
id.* at PageID.21 (noting Plaintiff's replied to Defendant's leadership by characterizing their
conduct as "completely unethical" and noting Plaintiff was "not even [seeking] the over $500,000
of pallets, tooling, [and] raw materials" that Defendants asked for Plaintiff to produce and
approved).
[7] In its initial, nonoperative Complaint, Plaintiff implied Defendant's outstanding balance on the
August 2020 Tooling Purchase Order was less than $65,410.50. *See* ECF No. 1 at PageID.23.

are pled in the alternative to Plaintiff's first breach of contract claim, in the event the 2020 Tier Sheet Agreement is not a valid contract. In Count IV, Plaintiff seeks—under the theory of promissory estoppel—compensatory damages for all 21,966 tier sheets it provided Defendant throughout their business relationship. *Id.* at PageID.155–56. Similarly, in Count V, Plaintiff seeks—under the theory of unjust enrichment—damages equal to Defendant's profits from using Plaintiff's tier sheets. *Id.* at PageID.157–58. Lastly, Plaintiff pursues a Michigan statutory conversion claim in Count VI, alleging Defendant has wrongfully retained the 10,416 tier sheets Plaintiff provided in December 2020. *Id.* at PageID.158–59.

Plaintiffs' Complaint is summarized as follows:

| Count | Claim |
|-------|-------|
| I | Breach of Contract (December 2020 Tier Sheet Agreement) |
| II | Breach of Contract (August 2020 Tooling Purchase Order) |
| III | Promissory Estoppel (Pallet Program Investment) |
| IV | Promissory Estoppel (Alternative to Count I) |
| V | Unjust Enrichment (Alternative to Count I) |
| VI | Statutory Conversion; MICH. COMP. LAWS § 600.2919a |

*See generally* ECF No. 1.

In April 2024, Defendant filed a partial motion to dismiss Counts III through VI for failure to state a claim under Civil Rule 12(b)(6). ECF No. 14.

## II.

Under Civil Rule 12(b)(6), a pleading fails to state a claim if it does not contain allegations that support recovery under any recognizable theory. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). When considering a Rule 12(b)(6) dismissal, the court accepts all factual allegations of the complaint as true and will construe the pleading in favor of the nonmovant. *See Lambert v. Hartman*, 517 F.3d 433, 439 (6th Cir. 2008). The plaintiff need not provide "detailed factual allegations" to survive dismissal, but the "obligation to provide the 'grounds' of his 'entitle[ment]

to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). In essence, the plaintiff's complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," but the court need not accept the complaint's legal conclusions as true. *Iqbal*, 556 U.S. at 678–79 (quotations and citation omitted).

## III.

Defendant concedes that the December 2020 Tier Sheet Agreement and the August 2020 Tooling Purchase Order are valid contracts. ECF No. 14 at PageID.206–07, 210–11. Thus, Defendant does not seek dismissal of Plaintiff's breach of contract claims, alleged in Counts I and II. *See generally* ECF No. 14. But Defendant argues that, as a matter of law, these two valid contracts preclude Plaintiff's quasi-contract (promissory estoppel and unjust enrichment) claims alleged in Counts III, IV, and V. *Id.* at PageID.214–19, 221–28. And Defendant argues the economic loss doctrine precludes Plaintiff's statutory conversion claim. *Id.* at PageID.219–21. This Court will first address the viability of Plaintiff's quasi-contract claims and then turn to Plaintiff's statutory conversion claim.

### A. Plaintiff's Quasi-Contract Claims

In Counts III, IV, and V, Plaintiff pursues two types of equitable "quasi" contract claims: promissory estoppel and unjust enrichment. Counts IV and V are pled in the alternative to Plaintiff's claim that Defendant breached the December 2020 Tier Sheet Agreement. But Defendant admits this Agreement is a valid contract, so Counts IV and V must be dismissed. Count III, on the other hand, is not precluded by any contract and is properly pled by Plaintiff.

### 1.

The equitable doctrine of promissory estoppel—alleged in Counts III and IV—was

developed to "protect the ability of individuals to trust promises in circumstances where trust is essential." *State Bank of Standish v. Curry*, 500 N.W.2d 104, 107 (Mich. 1993).  Under applicable Michigan law, in the absence of a valid *contract*, a court may enforce a *promise* between the parties so long as (1) the parties made a promise; (2) the promisee acted in reliance; (3) the promisor "should reasonably have expected to induce" the promisee's reliance; and (4) enforcing the promise avoids injustice. *Seither & Cherry Quad Cities, Inc. v. Oakland Automation, LLC*, No. 23-11310, 2024 WL 4507355, at *5 (E.D. Mich. Oct. 16, 2024) (citing *Curry*, 500 N.W.2d at 107). As recognized by the Sixth Circuit, Michigan law instructs that the doctrine of promissory estoppel "should be cautiously applied" only when the promise is "definite and clear," the facts are "unquestionable," and the wrong to be avoided is "undoubted." *Home-Owners Insurance Co. v. Boxer*, No. 23-1935, 2024 WL 4524741, at *7 (6th Cir. Oct. 18, 2024) (quoting *Marrero v. McDonnell Douglas Cap. Corp.*, 505 N.W.2d 275, 278 (Mich. Ct. App. 1993) and *Novak v. Nationwide Mut. Ins. Co.*, 599 N.W.2d 546, 552 (Mich. Ct. App. 1999)).

The equitable doctrine of unjust enrichment—alleged in Count V—has less to do with promises and more to do with property. Under Michigan law, unjust enrichment is defined as one party's "unjust retention of money or benefits which in justice and equity belong to another." *Tkachik v. Mandeville*, 790 N.W.2d 260, 266 (Mich. 2010) (internal quotations omitted). To succeed on "a claim of quantum meruit or unjust enrichment, a plaintiff must establish (1) the receipt of a benefit by defendant from plaintiff and (2) an inequity resulting to plaintiff because of the retention of the benefit by defendant." *Morris Pumps v. Centerline Piping, Inc.*, 729 N.W.2d 898, 904 (Mich. Ct. App. 2006). When successful, the court will "imply a contract" and require the defendant to disgorge any unjustly retained benefit as restitution. *Id.*; *see also Wright v. Genesee Cnty.*, 934 N.W.2d 805, 810 (Mich. 2019)

It is well-settled that equitable promissory estoppel and unjust enrichment claims cannot lie in the presence of a valid contract between the same parties governing the same subject matter. *See, e.g.*, *Morris Pumps v. Centerline Piping, Inc.*, 729 N.W.2d 898, 903 (Mich. Ct. App. 2006); *Able Demolition v. Pontiac*, 739 N.W.2d 696, 702, n. 4 (2007) (denying plaintiff's unjust enrichment, quantum meruit, and promissory estoppel claims because a valid contract governed the relevant relationship); *Lynch v. Sease*, 244 F. App'x 736, 739 (6th Cir. 2007) (noting "a plaintiff cannot recover under both" breach of contract and promissory estoppel for "the same promise").

And although Civil Rule 8(a) allows a party to *plead* equitable quasi-contract claims—like promissory estoppel and unjust enrichment—in the alternative to a breach of contract claims, FED. R. CIV. P. 8(a)(3), this alternative pleading is available only when contract validity is unknown or unclear. *See, e.g.*, *Ford Motor Co. v. Ghreiwati Auto*, 945 F. Supp. 2d 851, 870 (E.D. Mich. 2013) (collecting cases and noting a plaintiff's pleading of breach of contract "will preclude unjust enrichment or promissory estoppel claims" in "some instances"). When a plaintiff pleads a quasi-contract claim in the alternative to a breach of contract claim, and the defendant *admits* the contract in question is valid, a plaintiff's corresponding quasi-contract claims must be dismissed. *See Lynch v. Sease*, 244 F. App'x 736, 739 (6th Cir. 2007) ("Once it is established, either by an admission of a party or by a judicial finding, that there is in fact an enforceable contract between the parties, and therefore consideration exists, then a party may no longer recover under the theory of promissory estoppel." (quoting 28 Am. Jur. 2d *Estoppel and Waiver* § 57 (2000))); *Advanced Plastics Corp. v. White Consol. Indus., Inc.*, 828 F. Supp. 484, 491 (E.D. Mich. 1993), *aff'd*, 47 F.3d 1167 (6th Cir. 1995) (noting a plaintiff cannot proceed with a "quantum meruit or implied contract" claim if the "parties admit that a contract exists").

**2.**

Here, Counts IV and V are both quasi-contract claims pled in the alternative to Count I. In Count I, Plaintiff alleges Defendant breached the December 2020 Tier Sheet Agreement. ECF No. 11 at PageID.151–52. To the extent this Tier Sheet Agreement is *not* a valid contract, Plaintiff seeks to recover the value of all tier sheets it provided Defendant under promissory estoppel— Count IV—and seeks to recover the amount Defendant was unjustly enriched by charging its customers for use of Plaintiff's tier sheets. *Id.* at PageID.155–58. But Defendant has repeatedly conceded that the December 2020 Tier Sheet Agreement was a valid contract between the Parties. ECF Nos. 6 at PageID.85 ("[Defendant] does not dispute" that the December 2020 Tier Sheet Agreement and the August 2020 Tooling Purchase Order "are valid contracts."); 14 at PageID.205–06 ("[T]here is no question that the Tier Sheet Agreement was a valid contract."); 17 at PageID.361–62. And this undisputed valid contract governs Plaintiff's provision of tier sheets to Defendant, such that Plaintiff cannot, as a matter of law, seek quasi-contract damages arising from the same course of conduct. *Compare* ECF No. 11-7 at PageID.178 *with* ECF No. 11 at PageID.155–58.

But Defendant's admission is not the only reason these two quasi-contract claims are subject to dismissal. Both Counts IV and V—quasi-contract claims predicated on the invalidity of the Tier Sheet Agreement—confoundingly "incorporate" Plaintiff's allegation that the Tier Sheet Agreement *is* a valid contract. *See* ECF No. 11 at PageID.151 (alleging in Count I that "[t]he Tier Sheet Agreement constitutes a valid and binding contract between [Plaintiff] and [Defendant]"), PageID.155 ("Plaintiff incorporates each of the above allegations" in Count IV); PageID.157 (same, in Count V). Moreover, Plaintiff attached a copy of the signed, executed December 2020 Tier Sheet Agreement to its Amended Complaint. ECF No. 11-7. Plaintiff cannot have its contract

and eat it, too. *See Groeb Farms, Inc. v. Alfred L. Wolff, Inc.*, No. 08-CV-14624, 2009 WL 500816, at *7 (E.D. Mich. Feb. 27, 2009) (dismissing plaintiff's promissory estoppel claim because (1) "neither party disputes that there was a valid, binding contract between the parties," (2) plaintiff improperly "allege[d] the existence of an express contract in its claim for promissory estoppel" by "incorporat[ing] it[s] prior allegations of express and valid contracts" and "attach[ing] the relevant contract[] to the complaint"); *see also The Sharrow Grp. v. Zausa Dev. Corp.*, No. 04 C 6379, 2004 WL 2806193, at *3 (N.D. Ill. Dec. 3, 2004) (noting dismissal of alternative quasi-contract claims "is especially appropriate where the plaintiff has attached the relevant contracts to the complaint"). Thus, Counts IV and V will be dismissed.

**3.**

But Count III survives. Like Counts IV and V, Count III is a quasi-contract claim and seeks to recover—under the theory of promissory estoppel—over $600,000 in costs Plaintiff alleges it incurred, throughout two years, in reliance on Defendant's representations that the Pallet Program would come to fruition. ECF No. 11 at PageID.154–55. But, unlike Counts IV and V, Count III is *not* plead in the alternative to any breach of contract claim. *Compare id. with id.* at PageID.155–58. Indeed, Defendant concedes that the Pallet Program Agreement was never executed. ECF No. 14 at PageID.205. Still, Defendant seeks dismissal of Count III for two separate reasons. Neither is persuasive.

**a.**

First, Defendant argues Count III should be dismissed because, in its view, the reliance damages Plaintiff could theoretically recover arise from the same "subject matter" as the valid August 2020 Tooling Purchase Order. ECF No. 14 at PageID.221–22. Not so. The August 2020 Tooling Purchase Agreement narrowly required Defendant to pay a one-time fee of $82,489 as

consideration for Plaintiff's tooling of two specific pallet sizes for use in Defendant's Georgia Plant. *See* ECF No. 11-2 at PageID.164. In stark contrast, the unexecuted Pallet Program Agreement—according to Defendant's own CEO—was a "long-term service agreement where [Defendant] would pay [Plaintiff] [a] total monthly fee to cover" Plaintiff's investments, services, and sales margins. ECF No. 14-1 at PageID.232. Indeed, according to the most recent draft, the Pallet Program Agreement would have bound the Parties to a 5-year lease term involving tens of thousands of pallets and hundreds of thousands of tier sheets, collectively valued close to $5,000,000. ECF No. 11 at PageID.139.

True, as *part* of the proposed Pallet Program Agreement, Defendant agreed to pay Plaintiff for its tooling costs—the very $89,489 reflected in the August 2020 Tooling Purchase Order. *See* ECF No. 11 at PageID.139 (describing the August 2020 Tooling Purchase Order as necessary to "kick-off" the Parties' contemplated Pallet Program Agreement). And "[t]he Michigan Supreme Court has held that a party may not premise a promissory estoppel claim on pre-contractual representations where the parties reduce their agreement to a written contract." *DBI Invs., LLC v. Blavin*, 617 F. App'x 374, 386 (6th Cir. 2015) (*citing N. Warehousing, Inc. v. State, Dept. of Educ.*, 714 N.W.2d 287 (Mich 2006)). But the unexecuted Pallet Program Agreement significantly eclipses the executed Tooling Purchase Order. Indeed, the Pallet Program Agreement would have required Defendant to pay Plaintiff *60 monthly* rental payments, which increased each month in proportion to the number of pallets and tier sheets Plaintiff provided and Defendant acquired. *See* ECF No. 14-2 at PageID.251 (noting a $70,863 rental fee for each month beginning in November 2021, through April 2023). And Plaintiff has alleged it incurred additional costs through its *reliance* on Defendant's Pallet Program promises, which are in no way reflected in the August 2020 Tooling Purchase Order. Indeed, in Count III, Plaintiff expressly alleges it incurred

$615,043.81 in reliance costs attributable to its manufacture of (1) 1,084 56x44 pallets, (2) 2,120 56x44 pallet sheet tops, (3) 1,053 56x44 pallet sheet bottoms, (4) 6,244 bars for the 56x44 pallets, (5) 1,281 48x40 pallets, (6) 2,493 48x40 pallet sheet tops, and (7) 1,349 48x40 pallet sheet bottoms, not to mention the (8) 24,500 tier sheet blanks Plaintiff set aside for Defendant which were "awaiting modification."  ECF No. 11 at PageID.149, n. 8, *see also id.* at PageID.155

Accordingly, Defendant's "subject matter" argument is misplaced. To the extent that $89,489 of Plaintiff's alleged $615,043,81 reliance damages are directly attributable to its tooling work as contemplated in the August 2020 Tooling Purchase Order, such duplicity goes to damages, not dismissal. *See Hunter Square Off. Bldg., LLC v. Paragon Underwriters, Inc*., No. 235115, 2003 WL 21186651, at *7 (Mich. Ct. App. May 20, 2003) (distinguishing between breach of contract damages which "arise naturally from the breach" and, on the other hand, promissory estoppel damages which "may include . . . lost profits and out-of-pocket expenses incurred in preparation for performance or in the performing" of work induced by the promisor).

**b.**

Defendant then turns to Civil Rule 12(b)(6) and argues Count III should be dismissed because Plaintiff does not sufficiently allege (1) that Defendant *promised* to execute the master Pallet Program Agreement, nor (2) that Plaintiff *reasonably relied* on this promise. ECF No. 14 at PageID.222–26. But Defendant ignores the leniency of Rule 12(b)(6) review.

Under Michigan law, "[a] promise is a manifestation of intent[] to act or refrain from acting in a specified way, so made as to justify a promise in understanding that a commitment has been made." *State Bank of Standish v. Curry*, 500 N.W.2d 104, 108 (1993). Michigan courts historically vary between "strict and flexible" standards when determining whether a manifestation rises to the level of a promise sufficient to state a promissory estoppel claim. *Id*. Under a strict standard, "a

- 17 -

statement that is indefinite, equivocal, or not specifically demonstrative of an intention respecting future conduct[] cannot serve as the foundation for" a promise because it cannot reasonably induce reliance. *Id*. Yet, courts should take an objective approach and consider "[v]ariables such as" the parties' relationship, the circumstances surrounding the representation, as well as the representation's clarity. *Id*. at 108–09.

Defendant argues the Amended Complaint does not sufficiently allege Defendant's promise to execute the master Pallet Program Agreement because, in Defendant's view, it only made generic statements throughout "the course of preliminary negotiations." ECF No. 14 at PageID.222–26. Far from "preliminary negotiations," the well-pleaded facts of Plaintiff's Amended Complaint reflect a two-year pattern of Defendant's clear, consistent, and repetitive representations that it would execute the Pallet Program Agreement the Parties first began discussing in May 2020:

1. On June 25, 2020, Defendant responded to Plaintiff's draft rental agreement indicating it "would be delighted to work with" Plaintiff. ECF No. 11 at PageID.139.

2. On July 19, 2020, Defendant provided Plaintiff with the engineering specifications for the custom tier sheets and pallets contemplated in the Pallet Program. *Id.* at PageID.140.

3. On July 20, 2020, Defendant provided Plaintiff with traceability coding information for the contemplated Pallet Program. *Id.*

4. On August 11, 2020, Defendant issued the Tooling Purchase Order and asked for updated security deposit and monthly rental rates. *Id.*

5. On September 25, 2020, Defendant sent a "Pallet Combo onboarding schedule" to Plaintiff, which proposed Plaintiff's delivery of 5,000 Pallet Combos by December 2020, an additional 5,011 Pallet Combos by January 2021, and an additional 12,865 Pallet Combos by April 2021. *See* ECF No. 11-3 at PageID.166.

6. On September 30, 2020, Defendant told Plaintiff it was "prepared to accept" the Pallet Program Agreement, noting that if Plaintiff agreed to the most recent

terms, the Parties "ha[d] a deal." ECF No. 11 at PageID.141 (emphasis omitted).

7. On October 2, 2020, Defendant gave Plaintiff "written approval" to tool Defendant's custom pallets and tier sheets. *Id.*

8. In December 2020, Defendant asked for advance shipment of tier sheets for immediate use with its wooden pallet inventory, given the needs of the newly opened Georgia Plant. *See id.* at PageID.142–43.

9. In February 2021, Defendant accepted ten production-level pallets for testing. *Id.* at PageID.145.

10. On April 12, 2021, Defendant tested Plaintiff's Pallet Combos. *Id.*

11. On April 13, 2021, Defendant told Plaintiff that the Pallet Combos "pass[ed] testing" and that Defendant was "ready to move forward" with the Pallet Program Agreement. *Id.* at PageID.146.

12. On April 22, 2021, Defendant directed Plaintiff to produce "both pallet sizes and begin shipping all finished Pallet Combos" on June 1, 2021. *Id.*

13. In late May 2021, Defendant provided Plaintiff with written approval of "the final engineering specifications" Plaintiff needed to "kick off" Pallet Program production. *Id.*

14. In June 2021, in response to Plaintiff's production pause, Defendant "promised [it] will be taking the pallets." *Id.* at PageID.147 (internal quotations omitted).

15. On August 5, 2021, Defendant told Plaintiff it "was waiting to sign the [Pallet Program] Agreement because there were issues with Defendant's [tracing] equipment," but, once resolved, Defendant "would return the signed agreement." *Id.* Indeed, Defendant directed Plaintiff to "release" an additional 11,550 tier sheets "but to store them at [Plaintiff's] facility for expedited shipment" once Defendant's tracing equipment was "fully functional." *Id.*

16. On August 31, 2021, Defendant advised Plaintiff that it was conducting additional pallet tests but "ordered" Plaintiff to "ship all . . . manufactured/completed pallets and tier sheets [Plaintiff] had been storing once th[is] testing was complete[]." *Id.* at PageID.148.

At this juncture, these alleged representations reflect Defendant's "actual, clear, and definite promise." *Charter Twp. of Ypsilanti v. Gen. Motors Corp.*, 506 N.W.2d 556, 559, *appeal denied, cause remanded sub nom. Charter Twp. of Ypsilanti, Cnty. of Washtenaw v. Gen. Motors*

*Corp.*, 509 N.W.2d 152 (Mich. 1993). Michigan courts and this Court have found sufficiently alleged promises on far less. *See, e.g.*, *State Bank of Standish v. Curry*, 500 N.W.2d 104 (1993) (affirming jury's finding that a bank's representation that it would "continue to support" dairy-farming plaintiff rose above "mere[] words of assurance or statements of belief" to the level of an actual, clear "promise of future action").; *Glob. Tech., Inc. v. Yubei (Xinxiang) Power Steering Sys. Co.*, No. 12-CV-11144, 2013 WL 12181865, at *4 (E.D. Mich. Sept. 19, 2013) (finding promissory estoppel sufficiently pled because plaintiff "alleges in enough instances that [defendant] made representations and promises" which induced plaintiff's reliance). Indeed, in *Ypsilanti Cmty. Utilities Auth. v. MeadWestvaco Air Sys., LLC*, this Court held that the plaintiff stated a valid promissory estoppel claim by alleging that the corporate defendant "expressed its intent, plan, and commitment" to a joint venture. No. 07-CV-15280, 2008 WL 2610273, at *4 (E.D. Mich. June 30, 2008). And although the defendant in that case argued its statements were mere "puffery" that did not rise to the level of a promise, this Court held that argument was "more appropriate for a motion for summary judgment." *Id.* The same result here.

Defendant's additional argument that Plaintiff could not have reasonably *relied* on Defendant's purported promises, ECF 14 at PageID.226–27, similarly misses the mark and forgets the function of 12(b)(6) review. At the motion to dismiss stage, this Court is tasked with determining whether Plaintiff has adequately *pled* reliance, not whether Plaintiff's reliance was reasonable. *See Lifeline Ltd. No. II v. Connecticut Gen. Life Ins. Co.*, 827 F. Supp. 438, 443 (E.D. Mich. 1993) ("It is for a reasonable factfinder, and not for [the court] on a motion to dismiss, to determine the credibility of trust allegedly placed by plaintiff in defendant's alleged statements.") Plaintiff specifically alleges that it incurred $615,043.81 in costs "associated with manufacturing the Pallet Combos" expressly "[i]n reliance on [Defendant's] promises/agreements," ECF No. 11

at PageID.155. Nothing more is required.

In sum, Counts IV and V will be dismissed because they are precluded by the December 2020 Tier Sheet Agreement, which Defendant concedes is a valid contract between the Parties. On the other hand, Plaintiff's promissory estoppel claim relative to the unexecuted Pallet Program Agreement—Count III—survives Defendant's Motion to Dismiss because it is not precluded by a valid contract governing the same subject matter and is adequately pled.

## B. Plaintiff's Statutory Conversion Claim

Defendant also seeks dismissal of Count VI, Plaintiff's statutory conversion claim. ECF No. 14 at PageID.220. As explained below, Count VI will be dismissed.

"[C]onversion is a claim under both common and Michigan law." *Reed v. Presque Isle Cnty.*, 702 F. Supp. 3d 553, 584 (E.D. Mich. 2023). The common law tort of conversion is "any distinct act of dominion wrongfully exerted over another's personal property in denial of or inconsistent with his rights therein." *Aroma Wines & Equip, Inc. v. Columbian Distribution Servs., Inc.*, 871 N.W.2d 136, 144 (Mich. 2015) (internal quotations omitted). These wrongful acts of dominion include: (1) intentionally dispossessing another of chattel; (2) intentionally destroying or altering a chattel in the actor's possession; (3) using a chattel in the actor's possession without authority to use it; (4) receiving a chattel under a sale, lease, pledge, gift or other transaction intending to acquire for himself or another a proprietary interest in it; (5) disposing of a chattel by sale, lease, pledge, gift or other transaction intending to transfer a proprietary interest in it; (6) misdelivering a chattel; or (7) refusing to surrender a chattel on demand. *Id.*

In 1976, the Michigan Legislature adopted a statutory conversion remedy. *Aroma Wines*, 871 N.W.2d at 145. As amended, Michigan's statutory conversion remedy allows a plaintiff to recover three times the damages on a conversion claim if the plaintiff can additionally show the

- 21 -

defendant converted the plaintiff's property "to the [defendant's] own use." MICH. COMP. LAWS §

600.2919a(1)(a). As the Michigan Supreme Court recognizes, the Legislature's addition of this

element was intended "to limit [the statute] to a subset of common-law conversions." *Aroma*

*Wines*, 871 N.W.2d at 146. To prove that a defendant committed a statutory conversion, a plaintiff

must show, in addition to the elements of common law conversion, that "the defendant employed

the converted property for *some purpose personal to the defendant's interests*[.]" *Id*. at 148

(emphasis added).

Defendant does not argue that Plaintiff failed to adequately allege the elements of a

statutory conversion claim. *See* ECF No. 14 at PageID.220. Nor could it. Plaintiff alleges that

Defendant continues to possess over 10,000 of Plaintiff's tier sheets but has not paid for them.

ECF No. 11 at PageID.158–59. And the well-pleaded facts of Plaintiff's Amended Complaint

sufficiently allege Defendant has put these pallets to its "own use" by profiting from daily rental

fees it charged its customers. *Id.* at PageID.157 ("[Defendant] charged its glass customers a daily

rental fee for their use of [Plaintiff]'s tier sheets."). Instead of arguing Plaintiff failed to state a

statutory conversion claim, Defendant argues this claim is barred by the economic loss doctrine.

ECF No. 14 at PageID.220.

Like a valid contract's preclusion of quasi-contract claims premised on the same subject

matter, *see supra* Section III.A.1, the economic loss doctrine prevents a plaintiff's double-dipping

in both tort and contract. The "basic premise" of the economic loss doctrine is that "economic

losses that relate to commercial transactions are not recoverable in tort." *Tyson v. Sterling Rental*,

*Inc.,* 836 F.3d 571, 581 (6th Cir. 2016) (quoting *Quest Diagnostics, Inc. v. MCI WorldCom, Inc*.,

656 N.W.2d 858, 861 (Mich. Ct. App. 2002)); *see also Llewellyn-Jones v. Metro Prop. Grp., LLC*,

22 F. Supp. 3d 760, 778 (E.D. Mich. 2014) (noting the economic loss doctrine "prohibits a party

to a contract from bringing tort claims that are factually indistinguishable from breach of contract claims"); *Fraser Engine Rebuilder, Inc. v. Lancaster*, No. 360110, 2023 WL 5281853, at *5 (Mich. Ct. App. June 8, 2023) (explaining the economic loss doctrine applies only to contracts for products or goods, not services). "This doctrine separates damages stemming from breach of commercial contracts—in which buyers and sellers can negotiate their financial liability—and damages stemming from torts—in which no such negotiation occurs." *Dzurka Bros., LLC v. Luckey Farmers, Inc*., 712 F. Supp. 3d 979, 1004 (E.D. Mich. 2024).

But "[n]ot all tort claims . . . are barred by the existence of a contract." *DBI Invs., LLC v. Blavin*, 617 F. App'x. 374, 381 (6th Cir. 2015). Instead, "courts must inquire whether the legal duty allegedly violated by a defendant *arises separately and distinctly* from a defendant's contractual obligations." *Id.* (emphasis added); *see also Rinaldo's Const. Corp. v. Michigan Bell Tel. Co*., 559 N.W.2d 647, 658 (Mich. 1997) (noting "the threshold inquiry is whether the plaintiff alleges a violation of a legal duty separate and distinct from the contractual obligation").

Here, as discussed, the Parties agree that the December 2020 Tier Sheet Agreement is a valid contract. *See* ECF No. 14 at PageID.205–06. And, in Count I, Plaintiff alleges Defendant breached this contract by failing to pay for the tier sheets Plaintiff provided in December 2020. ECF No. 11 at PageID.151–52. Yet Plaintiff pursues statutory conversion for the exact same reason, alleging it "supplied 10,416 tier sheets to [Plaintiff]  in December 2020 . . . but [Defendant] has never paid for them." *Id.* at PageID.158. In this way, the legal duty Plaintiff alleges Defendant violated in its statutory conversion claim is not "separate and distinct" from the allegedly violated duty in Plaintiff's analogous breach of contract claim.[8] So, under the economic loss doctrine, the

---

[8] Plaintiff does not even attempt to argue that its statutory conversion claim alleges that Defendant violated a duty "separate and distinct" from those alleged in its analogous breach of contract claim. *See generally* ECF No. 16. Instead, Plaintiff argues that the economic loss doctrine categorically

latter claim bars the former. *See Glob. Fleet Sales, LLC v. Delunas*, No. 12-15471, 2016 WL 3251764, at *6 (E.D. Mich. June 14, 2016) (dismissing plaintiff's statutory conversion claim which arose "solely from a contractual dispute"). Count VI will be dismissed.

### V.

Accordingly, it is **ORDERED** that Defendant's Motion to Dismiss, ECF No. 14, is **GRANTED IN PART**, to the extent it seeks dismissal of Counts IV, V, and VI of Plaintiff's Amended Complaint.

Further, it is **ORDERED** that Defendant's Motion to Dismiss, ECF No. 14, is **DENIED IN PART,** to the extent it seeks dismissal of Count III.

Plaintiff's remaining claims are as follows:

| Count | Claim |
|---|---|
| I | Breach of Contract (December 2020 Tier Sheet Agreement) |
| II | Breach of Contract (August 2020 Tooling Purchase Order) |
| III | Promissory Estoppel (Pallet Program Investment) |

**This is not a final order and does not close the above-captioned case**.

Dated: November 26, 2024

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

---

does not bar Plaintiff's claim because Plaintiff pursues *statutory*, rather than *common law* conversion. Plaintiff's argument has two tenants: (1) MICH. COMP. LAWS § 600.2919a provides a distinct statutory cause of action "in addition to any other right or remedy" such as breach of contract, and (2) under general principles of Michigan law, statutes override conflicting common law. *Id.* at PageID.296–99. But the Sixth Circuit has rejected this argument. In *Tyson v. Sterling Rental, Inc.,* 836 F.3d 571(6th Cir. 2016), the lower court dismissed plaintiff's statutory conversion claim as barred by the economic loss doctrine in the presence of a valid contract. *Id.* at 581. The *Tyson* plaintiff appealed, raising the exact argument Plaintiff raises here. *Id.* But the Sixth Circuit was not convinced and emphasized that, under Michigan law, courts should apply the "separate and distinct" analysis—even to *sudatory* conversion claims under MICH. COMP. $600.2919a— when assessing whether the economic loss doctrine bars a claim. *Id.* at 581–83.

- 24 -